IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

LAWRENCE MELILLO,

               Plaintiff,

     v.                                 Civil Action No.
                                       7:06-CV-698 (LEK/DEP)

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY[1]

               Defendant.

_____

APPEARANCES:                OF COUNSEL:

FOR PLAINTIFF:

CONBOY, MCKAY LAW FIRM     LAWRENCE D. HASSELER, ESQ.
307 State Street
Carthage , NY 13619

LEKKI, HILL LAW FIRM         NATASHA B. HILL, ESQ.
227 East Orvis Street
Massena , NY 13662

_____

[1]     Plaintiff's complaint, which was filed on June 7, 2006, named Jo Anne B. Barnhart, the former Commissioner of Social Security, as the defendant.  On February 12, 2007, Michael J. Astrue took office as Social Security Commissioner.  Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, the court has therefore substituted him as the named defendant, and no further action is required to effectuate this change.  *See* 42 U.S.C. § 405(g) ("Any action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of Commissioner of Social Security or any vacancy in such office.")

FOR DEFENDANT:

HON. ANDREW T. BAXTER          TOMASINA DIGRIGOLI, ESQ.
United States Attorney for the   Special Assistant U.S. Attorney
Northern District of New York
Post Office Box 7198
100 South Clinton Street
Syracuse, New York 13261-7198

OFFICE OF GENERAL COUNSEL      BARBARA L. SPIVAK, ESQ.
Social Security Administration   Chief Counsel - Region II
26 Federal Plaza - Room 3904
New York, New York 10278

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

## REPORT AND RECOMMENDATION

Plaintiff Lawrence Melillo, who suffers from various conditions including cardiac disease, osteoarthritis, diabetes, bilateral hearing loss, vertigo, carpal tunnel syndrome, right shoulder pain, bilateral knee pain, major depressive disorder, anxiety disorder and obsessive compulsive disorder, has commenced this action pursuant to section 205(g) of the Social Security Act ("Act"), as amended, 42 U.S.C. § 405(g), seeking judicial review of the denial of his applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") payments by the Commissioner of Social Security.  In support of his challenge plaintiff asserts that in deciding he was not entitled to the benefits sought, the

administrative law judge ("ALJ") assigned by the agency to hear and determine the matter committed a number of errors including, *inter alia*, when determining the extent of his ability to perform in a workplace setting.  Plaintiff therefore seeks reversal of the Commissioner's determination and a remand of the matter to the agency for further proceedings.

Having carefully reviewed the evidence and proceedings before the agency, considered in the light of plaintiff's arguments, and applying the requisite deferential review standard, I find that the Commissioner's determination resulted from the application of proper legal principles, and is supported by substantial evidence in the record.

I.     BACKGROUND

Plaintiff was born in 1947; at the time the ALJ's decision in this matter was issued, he was 57 years old.[2]  AT 47.  Plaintiff is divorced, and lives alone in an apartment in Governeur, New York.  AT 350-51.  Plaintiff is a high school graduate, and has undertaken two semesters of college course work.  AT 366.

---

[2]      Portions of the administrative transcript (Dkt. No. 3), compiled by the Commissioner and largely comprised of the medical records and other evidence which was before the agency when its decision was made, will be cited herein as "AT ___."

Plaintiff last worked on or about July 22, 2003, at which time he was cleaning and effecting repairs to a house.[3]  AT 170, 382-84.  Plaintiff's other prior work experience includes employment as a loss prevention manager; an operations manager at a  restaurant, bakery, antique shop and organic farm; a director of security; an administrative assistant; a community college security supervisor; and an installer of underground and aerial communications wiring.  AT 66, 368-380.

    A.   <u>Medical Treatment History</u>

        1.   <u>Heart Condition</u>

Of the  many physical and mental conditions confronting plaintiff, the one that has required treatment over the longest span is his heart disease.  On April 1, 1991, plaintiff was seen at the State University Hospital, located in Syracuse, New York, by Joseph Battaglia, M.D., on referral from Dr. James Longo.  AT 125-26.  At that time plaintiff recounted a ten-year history of chest pain, but with new symptoms including a substernal tightness and pressure sensation radiating into his

---

[3]    In his applications for benefits, plaintiff asserted a disability onset date of June 28, 2003.  After finding, however, that plaintiff worked through the month of July and derived sufficient income from that situation for it to be deemed gainful employment, the ALJ confined his analysis to whether plaintiff was disabled at any time after July 31, 2003 and prior to the date of his decision.  *See* AT 16-17.

arms, as well as an incident of dizziness described as "associated near syncope" approximately three weeks prior to the date of the evaluation. AT 125-26.  A thallium exercise treadmill test conducted on that date yielded results described as "abnormal", and plaintiff was referred for elective cardiac catheterization.  *Id.*  An echocardiogram performed on that same date revealed the existence of concentric left ventricle hypertrophy and a localized wall motion abnormality in plaintiff's mid-IV septum, but with otherwise normal results.  AT 128-29.

On August 7, 2003 plaintiff was seen by Dr. James Longo of Cardiology, P.C. in Syracuse, New York, on referral from Dr. Chris Williams in Ogdensburg.  AT 218-22.   In a report of his examination Dr. Longo noted that plaintiff complained of sporadic palpitations which he might not experience for three weeks, but would then occur twice in a day. *Id.*  Dr. Longo reported that plaintiff's echocardiogram taken during the examination revealed, *inter alia*, excellent left ventricle systolic function, trace mitral regurgitation, and aortic valve sclerosis, to which Dr. Longo attributed plaintiff's heart murmur.  *Id.*  Based upon his evaluation, Dr. Longo strongly recommended that plaintiff take a statin-type drug.  AT 218.

On September 16, 2003, plaintiff was treated by Dr. Chris Comeau for complaints of chest pain.  AT 193-94.  Plaintiff was referred back to Dr. Longo, the cardiac specialist, who administered a stress echocardiogram test, from which Dr. Longo concluded that plaintiff exhibited good aerobic capacity, no dysrhythmias, and no echocardiographic evidence for ischemia, but with noted degenerative changes of the aortic and mitral valve.  AT 206-07, 281.

        2.   <u>Vertigo</u>

Plaintiff presented to the emergency room of the Edward J. Noble Hospital located in Governeur, New York, on February 15, 2001, complaining of a spinning sensation in his head with tenderness in his left occipital area and associated symptoms of vertigo as well as ataxia.  AT 133-35.  Based upon treatment and testing, which included a tomography scan of plaintiff's head proving to be negative, plaintiff was discharged on the following day with the final diagnosis of acute vertigo with labyrinthitis, sinusitis, possible trans-ischemic attack ("TIA"), and type two diabetes mellitus.  AT 136-38.  Medications prescribed upon plaintiff's discharge included Glynase, Avandia, Glucophage, aspirin, Meclizine, and Levaquin. AT 138.

### 3.   Shoulder/Rotator Cuff

Plaintiff was examined by Dr. Luc Perrier on March 4, 2002, complaining of a right shoulder injury sustained in December of 2001 that had progressively worsened, with pain extending into his biceps and triceps.  AT 139-40.  An x-ray of plaintiff's right shoulder revealed osteoarthritis at his acromioclavicular ("AC") joint.  An arthrogram subsequently conducted yielded evidence of a complete tear of plaintiff's right rotator cuff.  AT 141.  Plaintiff was referred for physical therapy in anticipation of surgery to repair the torn rotator cuff.  AT 141. Plaintiff underwent surgery to repair his tear on June 25, 2002, resulting in improvement including in his symptomology and an increased range of motion.[4]  AT 143-45.  Nine months after plaintiff's surgery, Dr. Perrier discerned no atrophy and observed that plaintiff had good passive range of motion except for a limitation of internal rotation.  AT 146. Plaintiff continued weekly physical therapy from January until May, 2003,

---

[4]      On August 15, 2002, plaintiff requested a medical release to complete a physical examination related to a Homeland Security baggage handler position for which he had applied.   AT 143-45.  The examination required plaintiff to carry two suitcases weighing forty pounds, and to lift one suitcase from the floor to chest height. At that time, plaintiff reported lifting his seventy-five pound golf bag with his left hand. Dr. Perrier stated he was not concerned with respect to plaintiff lifting a suitcase to knee height but expressed reservations regarding plaintiff lifting a bag weighing seventy pounds to chest height.  *Id.*  Dr. Perrier, nevertheless, granted plaintiff the release.  *Id.*

to address lingering shoulder pain.  *Id.*  AT 147-60.

### 4.   Hearing Loss

On referral from Dr. Christopher Williams of Ogdensburg, New York,

plaintiff was seen on January 27, 2003 by Dr. Vikram N. Patel, an

otorhinolaryngologist.  AT 161-62.  Based upon his examination of

plaintiff, Dr. Patel observed normal auricles, cerumen-free external

auditory canals and healthy eardrums, and did not discern any

nystagmus.  *Id.*

### 5.   Depression

On April 3, 2003, plaintiff began treating with Dr. David Butler, a

licensed psychologist in Potsdam, New York, to address increased

feelings of depression.  AT 164-65.  During the intake interview with Dr.

Butler, plaintiff recounted feeling nervous and having experienced panic

attacks in crowds, adding that he had lost control in his life.  *Id.*  Plaintiff

was also noted as having previously tried Zoloft, but finding that it gave

him a "sense of being out of control."  AT 165.  As a result of that initial

encounter, Dr. Butler diagnosed plaintiff as suffering from major

depressive disorder, panic disorder, and obsessive compulsive personality

disorder ("OCPD"), gauged as "moderate to severe" but with a prognosis

characterized as "good".  *Id.*

Despite Dr. Butler's initial optimism, treatments over the two months which followed revealed that plaintiff's condition had deteriorated, plaintiff noting that he felt demoralized, had resigned from his position at work and experienced suicidal ideations.  AT 165-68.  By July 22, 2003, however, plaintiff reported feeling more purposeful and less worried.  AT 120.  While noting significant improvement on that occasion, Dr. Butler recorded a diagnosis of depressive order, not-otherwise-specified ("NOS"), and obsessive compulsive disorder ("OCD").  AT 170.

Coinciding with his treatment with Dr. Butler, plaintiff was admitted as an involuntarily-committed inpatient to Claxton-Hepburn Medical Center ("Claxton -Hepburn") on May 29, 2003, where he remained until June 20, 2003.  AT 171-72.  While there, Melillo expressed thoughts of hopelessness and helplessness, demonstrating a dysphoric mood, constricted affect and decreased levels of attention and concentration.  AT 171.  Upon his admission, the attending physician diagnosed plaintiff with depressive disorder NOS, diabetes, hypertension, vertigo, bilateral hearing loss, and diabetic neuropathy, and assigned a global assessment

of functioning ("GAF") score of 35.[5]  AT 172.   By the time of his

discharge, plaintiff's GAF had risen to 50.[6]  AT 175.  During the month

following his discharge from Claxton-Hepburn, plaintiff resumed treating

with Dr. Butler, at which time he reported industriously tending to his

apartment and having experienced fewer bouts of crying.   AT 169-70.

Following his discharge from Claxton-Hepburn, plaintiff was seen on

June 27, 2003 at the Ogdensburg Mental Health Clinic for initial

screening.  AT 264.  Based upon that initial screening plaintiff was

accepted for further review and scheduled for an appointment on July 9,

2003 with Dr. Michael F. Camillo, a psychiatrist, and staff psychologist Dr.

Dan McGrath was also assigned to assist plaintiff.  AT 264-70. During the

course of plaintiff's treatment at the clinic, Dr. Camillo prescribed Lexapro

as well as Wellbutrin, the latter of which resulted in a noticeable

improvement in plaintiff's mood.  AT 169-70, 266.

---

[5]      A person's GAF is described as a "clinician's judgment of the individual's overall level of functioning."  Diagnostic and Statistical Mental Disorders 32 (4th ed., Text Revision 2000) ("DSM-IV-TR").  A person with a score of 35 experiences "[s]ome impairment in reality testing or communication . . . or a major impairment in several areas, such as work or school, family relations, judgment, thinking or mood (e.g., depressed man avoids friends, neglects family, and is unable to work . . . )."  DSM-IV at 34.

[6]      A GAF of 50 reflects "[s]erious symptoms . . .  or . . . serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  DSM-IV at 34.

6.    Ongoing Treatment

Plaintiff continued psychological treatment through the Ogdensburg Mental Health Clinic from February 26 through September 28, 2004.  AT 326-41.  During that period plaintiff participated in individual therapy based upon a cognitive behavioral approach to help him manage symptoms of major depressive disorder, and attended an anger management group. AT 326, 330.  Plaintiff reported responding positively to Lexapro as prescribed by Dr. Camillo.  AT 326.  By September 28, 2004, however, plaintiff's depression had increased and his mood was dysthymic.  AT 326-38.

During the time that plaintiff was seeking treatment for his mental health, he was also plagued with multiple ongoing physical conditions. Plaintiff was seen on June 30, 2003 by Dr. James Lunney, of Ogdensburg Family Practice, for his type two diabetes as well as related symptoms which included blurred vision, headaches, leg cramps, nocturia, peripheral neuropathy and polydipsia.  AT 271 -73.  During the examination, plaintiff also complained to Dr. Lunney regarding depression, with symptoms including anhedonia, anxious mood, change in appetite, altered sleep habits, crying spells, decreased ability to concentrate, fatigue, guilt,

sadness, feelings of worthlessness, and a tendency toward indecisiveness.  *Id.*  Dr. Lunney diagnosed plaintiff as suffering from type two diabetes, depression, and a systolic murmur, prescribing medications for the diabetes and ordering an electrocardiogram and echocardiography to address the murmur.  AT 271-73.

Between September 3 and November 12, 2003, plaintiff treated five times at Ogdensburg Family Practice.  AT 177-80.  On September 3, 2003, Dr. J. Williams sought to address plaintiff's palpitations, diabetes, osteoarthritis and depression, noting that plaintiff also presented symptoms of vertigo and a sore right shoulder.  AT 175-85.  In a report of his September 3, 2003 examination, Dr. J. Williams stated his opinion that plaintiff "can not [sic] be gainfully employed with all [his]" problems."  AT 177-78.  After noting that plaintiff had applied for disability benefits, Dr. J. Williams added that "[w]ith his multiple medical problems [h]e will not be able to work."  *Id.*

Plaintiff continued to treat with Dr. Comeau and Dr. J. Williams between December 10, 2003 and July 15, 2004 for diabetes and other symptoms including impotence, hypertension, fatigue, dizziness, parathesias, vertigo, depression with anhedonia, stress, insomnia and left

wrist pain.  AT 282-322.  On December 10, 2003, Dr. Comeau assessed

plaintiff's type two diabetes and diabetic neuropathy.  AT 282.  On

January 12, 2004, plaintiff had a diabetic follow-up visit with Dr. Comeau

during which he also complained of left wrist pain described as "constant,

moderate in intensity, sharp, stabbing, and tingling."  AT 285.

On February 10, March 29, June 15, and July 15, 2004, plaintiff had

follow-up appointments with Dr. J. Williams to treat his diabetes with

continued associated symptoms of blurred vision, headache, leg cramps,

nocturia, peripheral neuropathy, and polydipsia.  AT 311-22.  During that

time period, plaintiff was also treated for benign paroxysmal positional

vertigo, depression, erectile dysfunction, obsessive compulsive disorder,

osteoarthritis, rotator cuff syndrome and social anxiety disorder, and

additionally plaintiff was complaining of numbness and pain in his left

wrist, hand, forearm and upper arm.  *Id.*

On March 10, 2004, Dr. Comeau again saw plaintiff for a diabetic

follow-up, at which time he recorded that a nerve conduction study had

revealed bilateral slowing in plaintiff's arms, suspected to be the result of

diabetic neuropathy, and referred plaintiff to a neurologist.  AT 289-91.

On May 11, 2004, Dr. Comeau treated plaintiff regarding his depression,

at which time plaintiff reported that his diffuse joint pain had progressively worsened.  AT 295.

Based upon the  referral, plaintiff was tested by Dr. D. Jillapalli for evaluation of bilateral carpal tunnel syndrome and polyneuropathy.  AT 323-25.  On July 14, 2004, Dr. Jillapalli concluded that plaintiff suffered from mild carpal tunnel syndrome in his right wrist, but not his left.  AT 323.

### B.    Consultative Examinations

On July 31, 2003, Dr. Charles Moehs of Occupational Medicine Associates in Watertown, New York, examined plaintiff for the purpose of completing a functional capacity evaluation.  AT 277-80.  Dr. Moehs' diagnosis included depression, type two diabetes, and heart disease.  Dr. Moehs detected no evidence of nystagmus or vertigo, and observed a full range of motion in Melillo's neck, back and shoulders.  *Id.*  Based upon his examination Dr. Moehs concluded that while "[h]e might be able to do a minimal 1 hour of volunteer work per day," plaintiff should not otherwise work absent improvement in his mental stability.  AT 277-78.

Plaintiff was consultatively examined on October 23, 2003 by Dr. William Kimball, Ph.D., a psychologist.  AT 228-34.  In his report Dr.

-14-

Kimball noted that plaintiff exhibited a mixed affect during the examination, revealing both sadness about his life circumstances and good humor.  AT 231.  Dr. Kimball further noted that plaintiff seemed to experience anxiety around people and appeared to be irritable.  Dr. Kimball diagnosed plaintiff as suffering from depressive disorder NOS and obsessive personality features, and assigned a GAF score of 63.[7]  AT 231-33.  Dr. Kimball reported that plaintiff's mood was "not as down as it was in the past," although noting plaintiff had expressed concern that he could not perform some of his prior work due to his health.  AT 233.

On December 4, 2003, Dr. Abdul Hameed, a non-examining physician, performed a mental residual functional capacity ("RFC") assessment of plaintiff.  AT 243-60.  In the RFC assessment Dr. Hammed reported that plaintiff experienced mild difficulties in maintaining social functioning, concentration, persistence or pace, AT 253, but found no evidence of limitation in his ability to remember locations and work-like procedures, to carry out very short and simple instructions, or to make simple work-related decisions.  AT 257.  Dr. Hameed concluded that

---

[7]      A GAF score of 63 indicates "[s]ome mild symptoms OR some difficulty in social, occupational . . . functioning . . . but generally functioning pretty well, [and having] some meaningful interpersonal relationships."  DSM-IV at 34.

plaintiff "can understand instructions, remember and carry out work-related tasks."  AT 259.

On December 22, 2004, Dr. Richard Williams, a clinical psychologist, examined plaintiff and completed a report and psychological evaluation recording the results of his exam.  AT 342-44.  Prior to completing his evaluation, Dr. Richard Williams reviewed plaintiff's most recent treatment plans from the Ogdensburg Mental Health Clinic, his history of illness, portions of his treatment notes, and his subjective allegations as well as plaintiff's medications.  *Id.*  The report prepared by Dr. Richard Williams reflects that the plaintiff was well groomed, friendly, cooperative, alert, oriented and attentive; demonstrated good memory and judgment; and presented a sad mood but an appropriate affect during Dr. Richard Williams' evaluation.  AT 343.  Dr. Richard Williams diagnosed plaintiff as having major depressive disorder and assigned a GAF score of 50.[8]  AT 344.

On December 27, 2004, based upon his evaluation and review of relevant medical exams, Dr. Richard Williams completed a form designed

---

[8]      A GAF score of 50 indicates "[s]erious symptoms . . . OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  DSM-IV at 34.

to probe plaintiff's ability to perform work-related functions.  AT 345-47.  In that assessment Dr. Richard Williams found plaintiff's ability to understand, remember, and carry out instructions to be unaffected by the impairment.  AT 345.  He did, however, assess slight limitations in his ability to interact appropriately with the public, supervisors and co-workers as well in plaintiff's ability to respond appropriately to changes in a routine work setting.  AT 346.  Dr. Richard Williams also discerned a moderate limitation in plaintiff's ability to respond appropriately to pressures in a usual work setting.  *Id.*  In his written remarks, Dr. Richard Williams characterized plaintiff's depression as being "severe enough that it would affect his interpersonal functioning as well as his ability to cope with work stressors."  AT 346.

C.    Plaintiff's Hearing Testimony

During his hearing testimony, plaintiff recounted his most recent employment as a loss prevention manager at the Bon Ton, located at the Salmon Run Mall in Watertown, New York.  AT 368-72; *see also* AT 66-67.  Plaintiff testified that the maximum amount of weight that the position required him to lift was sixty-five pounds, and that the position entailed equal time standing or walking and sitting, and required bending.  AT 369.

Plaintiff testified that his working relationship with his supervisor

deteriorated toward the end of his employment, and that he felt insulted by

his supervisor's remarks and felt that she had unnecessarily compromised

his ability to effectively perform his job.  AT 371-72.  Plaintiff left the

position on May 29, 2003, four days short of the two-week notice period

provided under his resignation.[9]  *Id.*

In his testimony plaintiff also detailed other work performed and

positions held by him over the past fifteen years.  AT 372-83.  Plaintiff

testified that a combination of depression, his inability to grip with his

hands, body-wide arthritis, knee failure, torn ligaments in his left ankle,

type two diabetes, vertigo, hearing loss, carpal tunnel syndrome in his

right wrist, general anxiety, and obsessive compulsive behaviors has

prevented him from working.  AT 386-401.  Plaintiff testified that he can

stand and/or walk for an hour and sit for up to a total of five hours, and for

periods of thirty-five minutes at a time.  AT 406.

II.   PROCEDURAL HISTORY

A.   Proceedings Before the Agency

Plaintiff filed applications for DIB and SSI payments on July 23,

_____

[9]     Plaintiff was admitted as an in-patient to the hospital on the day he left
the position at Bon-Ton.  AT 368-72.

2003, asserting a disability onset date of June 28, 2003.  AT 47-49.

Following the denial of those applications and a hearing held on

November 17, 2004, in Ogdensburg, New York, at which plaintiff was

represented by counsel, ALJ J. Michael Brounoff issued a decision on

October 25, 2005 denying plaintiff's claim for benefits.   AT 15-27.

Based upon his *de novo* review of the record, and applying the now-

familiar, five-pronged sequential test for determining disability, at step one

the ALJ determined that while plaintiff did perform substantial gainful work

activity during July of 2003, the first month for which he claims disability

(citing plaintiff's work cleaning and repairing a home in Syracuse, New

York), resulting in earnings of $1,404.00 during that month, he has not

done so since July 31, 2003.  AT 16-17.  At step two of the disability

algorithm, ALJ Brounoff rejected plaintiff's type two diabetes, vertigo, and

arthritis as presenting impediments to his ability to perform basic work

activities, but determined that his depression with obsessive/compulsive

features described as "intermittent", right carpal tunnel syndrome, left

upper extremity right radiculopathy, aortic valve sclerosis, degenerative

mitral valve disease, mild left ventricle hypertrophy, status-post right

rotator cuff repair and bilateral hearing loss did qualify as severe.  AT 17-

22, 26.  The ALJ further concluded, however, that none of the medical conditions discerned were of sufficient severity to meet or medically equal, either singly or in combination, any of the listed, presumptively disabling impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1.  AT 26-27.

Before proceeding to step four of the disability inquiry, the ALJ first considered the limiting affects of plaintiff's physical and mental conditions upon his ability to perform work-related functions.  After conducting a survey of the available medical evidence and considering plaintiff's testimony regarding his limitations, the ALJ described plaintiff's RFC as follows:

> The claimant has the residual functioning capacity to lift and/or carry 50 pounds occasionally and 10 pounds frequently, stand and/or walk 6 hours in an 8 hour day and sit without restriction. He should avoid dust, heights and noise; can frequently bend; can occasionally squat; and should never crawl or climb.  He can grasp with both hands, push/pull and perform fine manipulation with his left hand only.  The claimant can understand, remember and follow simple, detailed and complex instructions and perform simple, detailed and complex tasks independently.  He can frequently interact with others and respond appropriately to changes in a routine work setting.  The claimant requires a job in the lower 50 percent of the stress continuum.

AT 25.  Relying upon answers of a vocational expert, Victor Gerard Alberigi, to interrogatories posed closely approximating plaintiff's condition

and limitations, *see* AT 106-120, at step four the ALJ concluded that despite his physical and mental conditions Melillo retains the capacity to perform certain of his past relevant work, including as a loss prevention manager, security guard and/or security guard supervisor, and therefore concluded that he is not disabled.  AT 25.  In arriving at his finding of no disability, the ALJ rejected plaintiff's reliance upon Rule 202.06 of the medical-vocational guidelines set forth in the regulations (the "grid"), 20 C.F.R. Pt. 404, Subpt. P. App. 2, since that rule, which would have dictated a contrary result, is based upon an RFC which includes only the exertional attributes of a light work finding, as distinct from the ALJ's conclusion that plaintiff retains the RFC to meet the he exertional requirements of medium work.[10]  AT 25.

---

[10]     The governing regulations define medium work as follows:

> Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds.  If someone can do medium work, we determine that he or she can also do sedentary and light work.

20 C.F.R. § 404.1567(c).  By contrast, light work as defined in the regulations is significantly more limiting:

> By regulation light work is defined as follows:

>> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight

The ALJ's decision became a final determination of the agency on April 7, 2006, when the Social Security Administration Appeals Council denied plaintiff's request for review of that opinion.  AT 6-8.

## B.   This Action

Plaintiff commenced this action on June 7, 2006.  Dkt. No. 1.  The Commissioner responded by compiling and forwarding to the court an administrative transcript of proceedings and evidence before the agency, Dkt. No. 3, followed by the filing of an answer on September 14, 2006, Dkt. No. 4.  With the filing of plaintiff's brief on October 30, 2006, Dkt. No. 6, and a brief on behalf of the Commissioner on December 13, 2006, Dkt. No. 8, the matter is now ripe for determination, and has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule

---

> lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.  If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b).

72.3(d).  *See also* Fed. R. Civ. P. 72(b).[11]

III.    DISCUSSION

A.    Scope of Review

Under 42 U.S.C. § 405(g) a court's review  of a final decision by the

Commissioner is limited; that review requires a determination of whether

the correct legal standards were applied and whether the decision is

supported by substantial evidence.  *Veino v. Barnhart*, 312 F.3d 578, 586

(2d Cir. 2002); *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000); *Schaal*

*v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998), superseded on other grounds

by *Figueroa v. Apfel*, 200 U.S. Dist. LEXIS 5759 (S.D.N.Y. April 28, 2000);

*Martone v. Apfel*, 70 F.Supp.2d 145, 148 (N.D.N.Y.1999) (Hurd, J.) (citing

*Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987)).  Where there is

reasonable doubt as to whether the Commissioner applied the proper

legal standards, his decision should not be affirmed even though the

ultimate conclusion reached is arguably supported by substantial

---

[11]    This matter has been treated in accordance with the procedures set forth in General Order No. 18 (formerly, General Order No. 43) which was issued by the Hon. Ralph W. Smith, Jr., Chief United States Magistrate Judge, on January 28, 1998, and subsequently amended and reissued by Chief District Judge Frederick J. Scullin, Jr., on September 12, 2003.  Under that General Order an action such as this is considered procedurally, once issue has been joined, as if cross-motions for judgment on the pleadings had been filed pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.

evidence.  *Martone*, 70 F.Supp.2d at 148.  If, however, the ALJ has

applied the correct legal standards and substantial evidence supports his

findings, those findings are conclusive, and the decision should withstand

judicial scrutiny regardless of whether the reviewing court might have

reached a contrary result if acting as the trier of fact.  *Veino*, 312 F.3d at

586; *Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988); *Barnett v.*

*Apfel*, 13 F.Supp.2d 312, 314 (N.D.N.Y. 1998) (Hurd, M.J.); *see also* 42

U.S.C. § 405(g).

　　　The term "substantial evidence" has been defined as " 'such relevant

evidence as a reasonable mind might accept as adequate to support a

conclusion.' "  *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420,

1427 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197,

229, 59 S. Ct. 206, 217 (1938)); *Jasinski v. Barnhart*, 341 F.3d 182, 184

(2d Cir. 2003).  To be substantial, there must be " 'more than a mere

scintilla' " of evidence scattered throughout the administrative record.

*Richardson*, 402 U.S. at 401; *Martone*, 70 F.Supp.2d at 148 (quoting

*Richardson*, 402 U.S. at 401).  "To determine on appeal whether an ALJ's

findings are supported by substantial evidence, a reviewing court

considers the whole record, examining the evidence from both sides,

-24-

because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams*, 859 F.2d at 258 (citing *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 715, S. Ct. 456, 464 (1951)).

When a reviewing court concludes that the ALJ has applied incorrect legal standards and/or that substantial evidence does not support the agency's determination, the agency's decision should be reversed. 42 U.S.C. § 405(g); *see Martone*, 70 F.Supp.2d at 148. In such a case the court may remand the matter to the Commissioner under sentence four of 42 U.S.C. § 405(g), particularly if deemed necessary to allow the ALJ to develop a full and fair record or to explain his or her reasoning. *Martone*, 70 F.Supp.2d at 148 (citing *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980)). A remand pursuant to sentence six of section 405(g) is warranted if new, non-cumulative evidence proffered to the district court should be considered at the agency level. *See Lisa v. Sec'y of Dep't of Health and Human Servs.*, 940 F.2d 40, 43 (2d Cir. 1991). Reversal without remand, while unusual, is appropriate when there is "persuasive proof of disability" in the record and it would serve no useful purpose to remand the matter for further proceedings before the agency.

*Parker*, 626 F.2d at 235; *Simmons v. United States R.R. Ret. Bd.*, 982

F.2d 49, 57 (2d Cir. 1992); *Carroll v. Sec'y of Health and Human Servs.*,

705 F.2d 638, 644 (2d Cir. 1983).

B.    Disability Determination-The Five Step Evaluation Process

The Social Security Act defines "disability" to include the "inability to

engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to

result in death or which has lasted or can be expected to last for a

continuous period of not less than 12 months[.]"  42 U.S.C. § 423(d)(1)(A).

In addition, the Act requires that a claimant's

> physical or mental impairment or impairments
> [must be] of such severity that he is not only
> unable to do his previous work but cannot,
> considering his age, education, and work
> experience, engage in any other kind of substantial
> gainful work which exists in the national economy,
> regardless of whether such work exists in the
> immediate area in which he lives, or whether a
> specific job vacancy exists for him, or whether he
> would be hired if he applied for work.

*Id.* § 423(d)(2)(A).

The agency has prescribed a five step evaluative process to be

employed in determining whether an individual is disabled.  *See* 20 C.F.R.

§§ 404.1520, 416.920.  The first step requires a determination of whether

-26-

the claimant is engaging in substantial gainful activity; if so, then the claimant is not disabled, and the inquiry need proceed no further. *Id.* §§ 404.1520(b), 416.920(b). If the claimant is not gainfully employed, then the second step involves an examination of whether the claimant has a severe impairment or combination of impairments which significantly restricts his or her physical or mental ability to perform basic work activities. *Id.* §§ 404.1520(c), 416.920(c). If the claimant is found to suffer from such an impairment, the agency must next determine whether it meets or equals an impairment listed in Appendix 1 of the regulations. *Id.* §§ 404.1520(d), 416.920(d); *see also id.* Part 404, Subpt. P, App. 1. If so, then the claimant is "presumptively disabled." *Martone*, 70 F. Supp. 2d at 149 (citing *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984)); 20 C.F.R. §§ 404.1520(d), 416.920(d).

If the claimant is not presumptively disabled, step four requires an assessment of whether the claimant's RFC precludes the performance of his or her past relevant work. 20 C.F.R. §§ 404.1520(e), 416.920(e). If it is determined that it does, then as a final matter the agency must examine whether the claimant can do any other work. *Id.* §§ 404.1520(f), 416.920(f).

The burden of showing that the claimant cannot perform past work lies with the claimant. *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996); *Ferraris*, 728 F.2d at 584. Once that burden has been met, however, it becomes incumbent upon the agency to prove that the claimant is capable of performing other work. *Perez*, 77 F.3d at 46. In deciding whether that burden has been met, the ALJ should consider the claimant's RFC, age, education, past work experience, and transferability of skills. *Ferraris*, 728 F.2d at 585; *Martone*, 70 F. Supp. 2d at 150.

### C.   The Evidence In This Case

In support of his challenge to the Commissioner's determination, plaintiff raises seven arguments, asserting that 1) the ALJ failed to assign proper weight to the opinions of his treating and examining physicians; 2) at step two of the disability analysis, the ALJ failed to properly assess the severity of his vertigo, diabetes, arthritis and knee impairment; 3) the ALJ failed to follow the required steps in considering the extent and impact of his depression, anxiety and obsessive compulsive disorders; 4) the ALJ failed to properly assess his RFC; 5) the ALJ mistakenly concluded that plaintiff can perform his past work; 6) the ALJ erroneously failed to find that the medical-vocational guidelines direct a finding of disabled for a

-28-

person of his age, education and work experience; and 7) the ALJ failed to

follow the requisite procedure for assessing his subjective allegations of

pain and disabling symptomology.

### 1.   Treating Physician

Plaintiff argues that the Commissioner failed to lend proper weight to

the opinions of his treating and examining physicians, specifically

referencing Dr. Lunney, Dr. J. Williams and Dr. Comeau, and that the ALJ

improperly assigned "substantial weight" to the medical conclusion of Dr.

Richard Williams, a one-time examining physician.  The Commissioner

counters that the ALJ properly evaluated the opinions of plaintiff's treating

sources in accordance with the applicable the regulations and found that

these opinions did not compel a finding of disability.

Ordinarily, the opinion of a treating physician is entitled to

considerable deference and is given controlling weight provided that it is

supported by medically acceptable clinical and laboratory diagnostic

techniques and is not inconsistent with other substantial evidence.  *Veino*

*v. Barhart*, 312 F.3d at 588;  *Barnett v. Apfel*, 13 F. Supp. 2d at 316.[12]

---

[12]The regulation which governs treating physicians provides:

> Generally, we give more weight to opinions from your
> treating sources . . . If we find that a treating source's

Such opinions are not controlling, however,  and may be reduced if contrary to other substantial evidence in the record, including the opinions of other medical experts.  *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004); *Veino*, 312 F.3d at 588.  The ALJ, however, "cannot arbitrarily substitute his or her own judgment for competent medical opinion." *McBrayer v. Sec'y of Health and Human Servs.*, 712 F.2d 795, 799 (2d Cir. 1983).

In deciding what weight, if any, an ALJ should accord to medical opinions, he or she may consider a variety of factors including "[t]he duration of a patient-physician relationship, the reasoning accompanying the opinion, the opinion's consistency with other evidence, and the physician's specialization or lack thereof[.]" *Schisler v. Sullivan*, 3 F.3d 563, 568 (2d Cir. 1993); *see* 20 C.F.R. §§ 404.1527(d)(2)-(6), 416.927(d)(2)-(6) (setting forth several factors to determine how much

---

opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.   When we do not give the treating source's opinion controlling weight, we apply [various factors] in determining the weight to give the opinion.

20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

weight to afford the opinion: the length of the treatment relationship, the

frequency of examinations by the treating physician for the condition(s) in

question, the medical evidence supporting the opinion, the consistency of

the opinion with the record as a whole, the qualifications of the treating

physician, and other factors tending to support or contradict the opinion).

When a treating physician's opinions are repudiated, the ALJ must

provide reasons for the rejection.  20 C.F.R. §§ 404.1527(d)(2),

416.927(d)(2).  Failure to apply the appropriate legal standards for

considering a treating physician's opinions is a proper basis for reversal

and remand, as is the failure to provide reasons for rejection of his or her

opinions.  *Johnson* v. Apfel, 817 F.2d at 985-86; *Barnett* v. Apfel, 13 F.

Supp. 2d at 316-17.

Despite the deference to which a treating physician's opinions are

ordinarily entitled, the ultimate finding of whether a claimant is disabled

and cannot work is "reserved to the Commissioner."  20 C.F.R. §

404.1527(e)(1).  Explaining the regulation, the Second Circuit has offered

"that the Social Security Administration considers the data that physicians

provide but draws its own conclusions as to whether those data indicate

disability.  A treating physician's statement that the claimant is disabled

-31-

cannot itself be determinative." *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999).

Dr. Lunney, Dr. J. Williams and Dr. Comeau have each offered opinions regarding plaintiff's RFC.  On June 30, 2003, after examining Melillo, Dr. Lunney completed an assessment form in which he noted his finding that plaintiff was not capable of working at that time, indicating that he could sit and walk for only two hours in an eight-hour work day and stand for four hours in an eight-hour work day.  AT 274-76.  Dr. Lunney further reported that plaintiff could frequently lift or carry up to ten pounds, and occasionally lift or carry up to as much as fifty pounds, but should never lift or carry above that weight.  *Id.*  Dr. Lunney cited plaintiff's torn right rotator cuff and depression in support of his diagnosis and listed depression, hearing deficits and diabetes mellitus as "pre-existing permanent disabilities."  AT *Id.*

The ALJ appropriately disagreed that plaintiff's torn right rotator cuff, depression and/or other pre-existing permanent disabilities would impose limitations on his ability to sit.  AT 23.  The ALJ nonetheless accorded substantial weight to Dr. Lunney's RFC assessment based upon "its detailed function-by-function assessment with cross-references to each

pertinent impairment." *Id.* ALJ Brounoff properly characterized as "conclusory" Dr. Lunney's opinion that plaintiff was not capable of working and determined that Dr. Lunney's general opinion was entirely inconsistent with his "more detailed and persuasive" function-by-function specific assessment, and thus afforded it "little weight." *Id.*

Plaintiff also complains of the ALJ's rejection of a similar conclusion of Dr. J. Williams, recorded in a report dated September 8, 2003 following an examination of the plaintiff on September 3, 2003. AT 178-80. In his report, Dr. J. Williams identified Melillo's multiple medical problems, including chronic depression, a right arm that has chronic pain and limited range of motion of the shoulder, chronic vertigo, and diabetes, and concluded he "cannot be gainfully employed with all these problems." AT 23, 177-78. Dr. J. Williams' report, however, does not correlate Melillo's conditions with specific exertional or non-exertional limitations on his ability to perform work related functions, instead merely stating in a wholly conclusory fashion the ultimate opinion that plaintiff is unable to work. *Id.* The ALJ considered Dr. J. Williams' opinion regarding plaintiff's ability to work, but did not afford it any significant weight, noting that such a determination "is an issue reserved to the Commissioner" pursuant to 20

-33-

C.F.R. § 404.1527(e).  AT 23.  Given the nature of Dr. J. Williams' opinion

and his failure to identify specific limitations imposed by plaintiff's medical

conditions, it was properly rejected.

The third treating source cited by the plaintiff in his brief is Dr.

Comeau, who completed a medical source statement on January 12,

2004, regarding plaintiff's ability to perform work-related physical activities.

AT 306-09.  Based upon his assessment of plaintiff's severe osteoarthritis

of the knees, rotator cuff syndrome and vertigo, Dr. Comeau opined that

plaintiff can lift or carry twenty pounds; can stand and/or walk for at least

two hours in an eight hour work day; cannot climb, balance, or crawl; and

can kneel, crouch or stoop for up to one-third of an eight-hour work day.

*Id.*  Dr. Comeau further found that plaintiff's impairments limit his ability to

work or stand to two hours in an eight-hour work day, but do not restrict

his ability to sit.  *Id.*  Dr. Comeau additionally found that plaintiff's

conditions limit his manipulative functioning and that his communicative

limitations are somewhat restricted based upon plaintiff's bilateral hearing

loss.  *Id.*

On January 14, 2004, Dr. Comeau completed a form addressing his

clinical assessment of plaintiff's pain.  AT 310.  Responding to questions

-34-

designed to gauge the effects of plaintiff's pain on his ability to perform

work functions, Dr. Comeau wrote that plaintiff's pain is "present to such

an extent to be distracting to adequate performance of . . . work,"  adding

that physical activity "greatly increases pain causing abandonment of

tasks related to . . . work" and that plaintiff's medication compromises his

effectiveness in the workplace due to distraction, inattention and

drowsiness.  *Id.*

Faced with what he regarded as irreconcilable conflicting opinions of

Dr. Lunney and Dr. Comeau, two treating sources practicing within the

same Ogdensburg Family Practice Group, the ALJ embarked on an

analysis calculated to determine which to accept.  AT 24.  Noting that Dr.

Comeau's findings are inconsistent with those of Dr. Lunney, and that "Dr.

Comeau cited very few objective findings to support his opinions[,]" and

with the exception of Dr. Lunney's opinions regarding plaintiff's inability to

sit as not being supported by medical evidence, the ALJ concluded that

Dr. Lunney's assessment was entitled to greater weight.  AT 24.  Since it

is well-accepted that an opinion of a treating physician is not entitled to

controlling weight where it is inconsistent with other substantial evidence

in the record, including opinions from other treating sources or medical

experts, the ALJ's rejection of Dr. Comeau's opinions did not constitute error. *Halloran* v. *Barnhart*, 362 F.3d at 32.

It is true, as plaintiff's argues, that various laboratory results and diagnostic testing support the opinions of Dr. Lunney, Dr. J. Williams, and Dr. Comeau.   The record includes, for example, notations of physical examinations conducted by both Dr. Lunney and Dr. Comeau, revealing decreased range of motion in plaintiff's right shoulder abduction and external rotation, AT 272, 301; a nerve conduction study by Dr. Comeau of plaintiff's arms, revealing bilateral slowing, AT 289; bilateral medium motor studies conducted by Dr. Jillapalli, revealing mild carpal tunnel syndrome in the right wrist,  AT 323; clinical findings regarding plaintiff's seventy percent loss of hearing in the left ear and thirty-five percent in the right by Dr. Comeau, AT 308; as well as various psychiatric and psychological assessments, *see, e.g.* AT 171-76 (Claxton-Hepburn), AT 164-70 (psychological therapy from Dr. David C. Butler Ph.D. from April 2003 through July of that year); AT 264-70, 326-38 (records of psychiatric treatment from Ogdensburg Mental Health Clinic from June of 2003 until September 28, 2004).  The support of medically accepted clinical and laboratory diagnostic techniques is, however, only part of the equation.

An ALJ must also consider the consistency of opinions, balanced against other substantial evidence in the record. *Schisler* v. *Sullivan*, 3 F.3d at 568. Where conflicts arise in the form of contradictory medical evidence, their resolution is properly entrusted to the Commissioner. *Veino*, 312 F.3d at 588.

"The opinions of state agency consultative examiners may constitute substantial evidence to support an ALJ's determination, provided that there is other supporting evidence in the record." *Taylor v. Astrue*, 3:05-CV-1444, 2008 WL 3884356, at *13 (N.D.N.Y. Aug. 18, 2008) (Kahn, D.J.) (citing 20 C.F.R. §§ 404.1527(f), 416.927(f)). *Schisler*, 3 F.3d at 568 (explaining that the regulations "permit the opinions of nonexamining sources to override treating sources' opinions, provided they are supported by evidence in the record.") (citing 20 C.F.R. §§ 404.1527(f), 416.927(f)). In crediting Dr. Richard Williams' opinion with substantial weight, the ALJ cited other substantial evidence in the record.

The conclusory opinions of plaintiff's treating physicians regarding plaintiff's ability to work were both internally inconsistent and in conflict with other substantial evidence. Having carefully weighed plaintiff's arguments, I find that the ALJ's decision to accord less than controlling

-37-

weight to the opinions of Dr. Lunney, Dr. J. Williams and Dr. Comeau was both properly explained and is supported by substantial evidence.

      2.     <u>The ALJ's Decision To Give Weight To A Consultative Examiner</u>

Plaintiff also assigns error to the ALJ's determination that the opinion of Dr. Richard Williams, to the effect that plaintiff has no limitations in his ability to understand, remember, and carry out instructions, and only slight limitations in his ability to interact appropriately with the public, supervisors and co-workers and respond appropriately to changes in a routine work setting, is deserving of substantial weight.  In making that determination the ALJ noted that Dr. Richard Williams' examination findings supported his opinions, as did those of Dr. Kimball.  The ALJ therefore chose properly to credit the opinion of Dr. Richard Williams, although only a one-time consultative examiner.  *Taylor*, 2008 WL 3884356, at *13.

      3.     <u>Failure to Properly Assess The Severity of Plaintiff's Vertigo, Diabetes, Arthritis And Knee impairment</u>

Plaintiff next maintains that the ALJ's determination that his vertigo, type two diabetes, arthritis and knee impairment were not of sufficient severity to qualify for consideration at step two is not supported by

substantial evidence.

The second step of the disability review process is calculated to determine which of plaintiff's impairments are "severe." 20 C.F.R. §§ 404.1520(c), 416.920(c). In assessing whether a plaintiff has a severe impairment, an ALJ must consider the objective medical and nonmedical facts, medical opinions based upon these facts, diagnoses, and plaintiff's subjective complaints of pain. *See Bluvband v. Heckler*, 730 F.2d 886 (2d Cir. 1984) (superseded by regulation on other grounds). An impairment is severe if it "significantly limits physical or mental abilities to do basic work activities." 20 C.F.R. §§ 404.1520(c), 416.920(c). Conversely, an impairment is not severe if it does not significantly limit an individual's ability to perform basic work activities. *McConnell v. Astrue*, 6:03-CV-0521, 2008 WL 833968, at *11 (N.D.N.Y. Mar. 27, 2008) (McAvoy, Sr. J.) (citing 20 C.F.R. § 404.1521(a)). The regulations define "basic work activities" as the "abilities and aptitudes necessary to do most jobs," examples of which include:

> (1) Physical functions such as walking, standing, lifting, pushing, pulling, reaching, carrying, or handling; (2) Capacities for seeing, hearing, and speaking; (3) Understanding, carrying out, and remembering simple instructions; (4) Use of judgment; (5) Responding appropriately to supervision, co-workers and usual work situations; and (6) Dealing with

changes in a routine work setting.

20 C.F.R. § 404.1521(b).  "Step Two may do no more than screen out *de minimis* claims."  *Dixon v. Shalala*, 54 F.3d 1019, 1030 (2d Cir. 1995).

If a claimant has multiple impairments, the combined effect of all impairments should be considered "without regard to whether any such impairment, if considered separately, would be of sufficient severity."  20 C.F.R. § 404.1523; 42 U.S.C. § 423(d)(2) (B); *see also Schulte v. Apfel*, No. 98-CV-422E, 2000 WL 362025 (W.D.N.Y. Mar. 31, 2000) (Elfin, D.J. and Foschio, M.J.).  "A finding of 'not severe' should be made if the medical evidence establishes only a 'slight abnormality' which would have 'no more than a minimal effect on an individual's ability to work.' "  *Rosario v. Apfel*, No. 97 CV 5759, 1999 WL 294727, at *5 (E.D.N.Y. Mar. 19, 1999) (Nickerson, D.J.) (quoting SSR 85-28, 1985 WL 56856, at *3, Titles II and XVI: Medical Impairments That Are Not Severe (S.S.A.1985)).  The Commissioner has cautioned that

> [g]reat care should be exercised in applying the not severe impairment concept.  If an adjudicator is unable to clearly determine the effect of an impairment or combination of impairments on the individual's ability to do basic work activities, the sequential evaluation process should not end with the not severe evaluation step.

SSR 85-28 (quoted in *Bowen v. Yuckert*. 482 U.S.137, 158 (1987)

-40-

(O'Connor, J. concurring).  Even if the ALJ makes a finding of "not severe" with respect to a particular impairment, he or she must nonetheless evaluate the "combined impact [of a claimant's impairments] on a claimant's ability to work, regardless of whether every impairment is severe."  *Dixon*, 54 F.3d at 1031; *see Foster v. Bowen*, 853 F.2d 483, 490 (6th Cir. 1988) ("The Social Security Act requires the Secretary to consider the combined effects of impairments that individually may be nonsevere, but which in combination may constitute a medically severe impairment or otherwise evince a claimant's disability.") (citing 42 U.S.C. § 423(d)(2)(C)).

### a.    Type Two Diabetes

The record in this case establishes, without contradiction, that the plaintiff suffers from type two, non-insulin requiring diabetes.  *See* AT 177. The record does not disclose, however, any evidence of complications related to that condition, and objective medical testing has failed to identify that the condition was severe or rendered plaintiff disabled. Although there has been some suggestion of neuropathy, there is no evidence that the neuropathy has caused plaintiff to suffer exertional difficulties or was otherwise severe.  *Edwards v. Barnhart*, Civil No. 3:06CV402, 2007 WL 708802, *10-11 (D. Conn. March 6, 2007).   Under

these circumstances, plaintiff has failed to sustain his burden of demonstrating at step two that his type two diabetes is sufficiently severe to warrant further consideration at that step in the analysis. *Pinckney v. Astrue*, No. 06-CV-6625, 2009 WL 750061, *5 (E.D.N.Y. March 17, 2008).

        b.   <u>Vertigo</u>

Plaintiff also argues that his history of vertigo should have been considered as sufficiently severe to qualify for step two of the disability analysis. Once again, however, other than his subjective complaints the record is devoid of clinical evidence demonstrating the loss of functions or documented inability to perform work-related functions stemming from the vertigo. When the issue of vertigo was raised in conjunction with plaintiff's hospitalization in February of 2001, a CT scan of his head yielded negative results, demonstrating no bleeding, gross infarction or tumor.[13] AT 133. Plaintiff was discharged on the day following his admission in satisfactory and improved condition, and there is no evidence in the record that plaintiff required further hospitalization or treatment of his vertigo. AT 136-38.

_____

[13]     During the course of that hospitalization plaintiff declined a recommendation that he undergo ultrasound testing, noting that he had had one within the prior year with essentially normal results. AT 133.

As the ALJ noted, in January of 2003 otorhinolaryngologist Dr. Vikram Patel found that plaintiff's cranial nerves were grossly intact and that there was no evidence of nystagmus.  AT 161-62.  Similarly, in July of 2003, Dr. Moehs likewise found no nystagmus or evidence of vertigo.  AT 277-80.

As the ALJ noted in his decision, it is true that plaintiff repeatedly presented to various medical providers and consultants with ongoing complaints of vertigo, and Meclizine was prescribed to address the condition.  *See, e.g.,* AT 133-38, 161-62, 177-80.  Various testing and examinations by treating sources, however, has failed to yield any objective evidence to support plaintiff's position.  By way of example, on September 3, 2003, Dr. J. Williams conducted a neurological examination of plaintiff, revealing intact cranial nerves, motor and sensory function, reflexes, gait and coordination.  AT 179.  Similarly, the report of a neurological examination performed by Dr. Comeau on December 10, 2003, while noting plaintiff's subjective complaint of dizziness, paresthesias and vertigo, was negative for ataxia, headaches, memory loss, seizures, or tremor, and additionally, as the ALJ observed, was also

negative for dysuria, hematuria and polyuria.[14]  AT 282.  Conspicuously

absent from the record is any indication, including from a treating source,

that plaintiff's vertigo has had any more than a minimal impact upon on his

ability to perform work-related functions.  Absent such evidence, the ALJ's

conclusion that vertigo was not sufficiently severe to qualify as an

impairment at step two of the disability analysis is well-supported.

c.    Arthritis

At various times plaintiff has been diagnosed by two of his treating

physicians, Dr. J. Williams and Dr. Chris Comeau, as suffering from

osteoarthritis in several locations, including his right knee.  *See e.g.* AT

177-217, 281-305.  During the hearing, plaintiff testified that his arthritis is

literally body-wide, but particularly affects the areas from his ankles to his

knees.   AT 392-93.  Plaintiff contends that on the basis of these findings

and his testimony the ALJ should have concluded that his arthritis

qualified at step two as severe.

Aside from plaintiff's right shoulder condition, which the ALJ

acknowledged presents limitations to his ability to perform work-related

---

[14]      Dysuria, hematuria and polyuria are conditions relating to urination
(*Dorland's Illustrated Dictionary,* 592, 844, 1516.  (31st ed. 2007); as such, their
relevance to plaintiff's complaints of vertigo is not immediately apparent.

functions, *see* AT 18, the record is lacking in any objective evidence of

arthritis at other body locations with more than a minimal impact upon

plaintiff's ability to perform work-related functions.  While in 1993 plaintiff

appears to have recounted a history of a knee injury occurring some

twenty-six years prior to that time, while in military service, *see* AT 131,

the record contains no diagnostic evidence such as, for example, x-rays or

magnetic resonance imaging ("MRI") testing with respect to plaintiff's knee

which might support a diagnoses of either osteoarthritis or rhuematory

arthritis.  Given this lack of evidence, the ALJ properly concluded that

except with respect to his right shoulder, plaintiff's claimed arthritis does

not impact upon his ability perform work-related functions.

### 4.    Evidence of Plaintiff's Mental Condition

In the next argument raised in his brief, plaintiff asserts that the ALJ

failed to follow the required protocol for analyzing the limiting affects, if

any, of his mental condition upon his ability to perform work functions.  In

response, the Commissioner submits that substantial evidence supports

the ALJ's conclusion that plaintiff's mental condition does not prevent him

from working.

When presented with evidence of a mental impairment which

allegedly prevents a claimant from working, the Commissioner must follow a special procedure at each level of administrative review.  *See* 20 C.F.R. §§ 404.1520a, 416.920a.  The Commissioner first records the pertinent signs, symptoms, findings, functional limitations, and effects of treatments contained in the record.  *Id.* §§ 404.1520a(b)(1), 416.920a(b)(1).  If a mental impairment is determined to exist, the Commissioner must next indicate whether certain medical findings which have been found especially relevant to the ability to work are present or absent.  *Id.* §§ 404.1520a(b)(2), 416.920a(b)(2).  In doing so the Commissioner rates the degree of functional loss resulting from the impairment – on a scale ranging from no limitation to severe limitation, the latter of which is incompatible with the ability to do work-like functions – analyzing four specific factors, including 1) activities of daily living; 2) social functioning; 3) concentration, persistence, and pace; and 4) deterioration or decompensation in work or work-like settings.  *Id.* §§ 404.1520a(c)(3), 416.920a(c)(3).

The Commissioner must then determine the severity of the mental impairment.  *Id.* §§ 404.1520a(d), 416.920a(d)(2).  Where the Commissioner rates the degree of limitation in the first three functional

areas as "none" or "mild", and "none" in the fourth functional area, the Commissioner will generally conclude that claimant's impairment is not severe, unless the evidence indicates otherwise. *Id.* §§ 404.1520a(d)(1), 416.920a(d)(1).  If, on the other hand, the Commissioner finds the claimant's medical impairment to be severe, he must determine whether it meets or equals a listed mental disorder. *Id.* §§ 404.1520a(d)(2), 416.920a(d)(2).  In the event the impairment is deemed severe, but does not meet or equal a listed mental disorder, the Commissioner next analyzes the claimant's RFC, considering whether he or she is limited in the ability to carry out certain mental activities – such as limitations in understanding, remembering, and carrying out instructions, and in responding appropriately to supervision, co-workers, and work pressures in a work setting – to such a degree as to reduce his or her ability to do past relevant work and other work.  *See* 20 C.F.R. §§ 404.1520a(d)(3), 404.1545(c), 416.920a(d)(3), 416.945(c).

An ALJ is no longer required under the governing regulations to append a psychiatric review technique form ("PRTF") to his or her decision when addressing a case in which a psychological impairment is implicated.  65 Fed. Reg. 50746-01 (Aug. 21, 2000), *available at* 2000 WL

1173632, at *50758.  The ALJ is, however, nonetheless subject to the requirement that an analysis of whether a mental impairment exists be incorporated, or in some way embodied, within his or her decision when evidence of such an impairment is presented.  20 C.F.R. §§ 404.1520a.

To trigger these requirements a claimant bears the initial responsibility of providing medical evidence sufficient to indicate the potential existence of a mental impairment.  *Howell v. Sullivan*, 950 F.2d 343, 348 (7th Cir. 1991) (citing 20 C.F.R. §§ 404.1508, 404.1514).

In his decision, the ALJ chronicled plaintiff's recent mental health history, specifically noting his symptoms and treatments with mental health providers.  AT 18-20.  The ALJ referenced Dr. Butler's diagnoses of depressive disorder and obsessive compulsive disorder in April 2003, and noted that by May 28, 2003 plaintiff reported that he was sleeping in his truck and presented what was regarded as a moderate to high risk for suicide.  *Id.*  The ALJ also noted plaintiff's hospitalization for suicidal ideations and severe depression from May 29 to June 20, 2003.  *Id.*

The ALJ further noted, however, and apparently found persuasive, the fact that subsequent reports generated by various treatment providers showed significant improvement in plaintiff's mental condition through the

-48-

remainder of 2003, and into the following year.  *Id.* at 19.  The ALJ

observed, for example, that plaintiff was seen at the Ogdensburg Mental

Health Clinic on June 27, 2003, for an initial screening, at which time he

demonstrated appropriate eye contact, was polite and cooperative and

had a neutral mood.  AT 18.  Although plaintiff's affect was reported to be

slightly guarded and his depression was found to be in the severe range, it

was also noted that his sleep had improved, his appetite was good and

suicidal ideations were not present.  *Id.*

By all accounts, through treatment under the auspices of Dr.

Camillo, and with counseling by psychologist Dan McGrath, plaintiff's

mental condition improved considerably from that point.  *See* AT 267.

Notes of Dr. Butler, the licensed psychologist who treated plaintiff over

time, beginning on April 3, 2003, reveal that by July of that year Dr. Butler

had discerned significant improvement, reporting that plaintiff had a

capacity for interest, had good energy and was feeling some ambition,

although he was reportedly still experiencing minimal pleasure and

enjoyment.  AT 164-70.  These findings are similar to those observed

during an consultative examination conducted on October 23, 2003 by Dr.

Kimball who, based upon his evaluation, diagnosed plaintiff as suffering

from depressive order, not otherwise specified, with obsessive personality features.  AT 233.

By January of 2004, according to Dr. Comeau, plaintiff demonstrated appropriate affect and demeanor as well as normal speech pattern and memory.  AT 287.  Plaintiff's progress continued into the middle of 2004, with psychologist Dan McGrath reporting on June 1, 2004 that the plaintiff was progressing with a consistently euthymic mood and denying thoughts of harming himself or others.  AT 366.  That observation is consistent with later findings of Dr. J. Williams who, in June of 2004, found his "[d]epressive symptoms much better."  AT 317.  Plaintiff apparently regressed thereafter, however, leading psychologist McGrath to report in September of 2004 that plaintiff's depression had increased and that his mood had turned dysthymic, leading his mental health providers to increase his Wellbutrin dosage.  AT 338.

Despite this downturn, the results of a psychiatric consultation conducted by Dr. Richard Williams on December 22, 2004 revealed that plaintiff appeared at that time to be alert and oriented, with good attention and concentration and good abstract thinking and judgment.  AT 342-44. The doctor also reported that plaintiff's mood was sad and his affect

-50-

appropriate, and that his sleep pattern had improved through use of Wellbutrin, additionally describing his diet as "decent".  *Id.*

After reviewing the available medical evidence related to plaintiff's depression, the ALJ determined that he has no restrictions in his activities of daily living; mild difficulties in maintaining social functioning; mild limitation in maintaining concentration, persistence, or pace, and with one initial episode of decompensation.  AT 20.  The ALJ thereby determined that the "c" criteria of the listings pertaining to mental impairments could not be met.  Based upon his findings and the extent of plaintiff's daily activities the ALJ concluded that a more restrictive mental component of the RFC was not warranted.  *Id.*  Having concluded that the ALJ properly considered the potentially limiting affects of plaintiff's mental condition, utilizing the methodology prescribed by the regulations, and that the resulting conclusions are supported by substantial evidence, I recommend plaintiff's argument in this regard be rejected.

### 5.   Failure To Properly Assess Plaintiff's RFC

Plaintiff argues that the Commissioner failed to properly assess the limitations associated with his physical conditions when arriving at his RFC determination.  Plaintiff contends that had the ALJ properly

considered the opinions of Dr Lunney, Dr. J. Williams and Dr. Comeau, he

would have been obliged to find that Melillo cannot perform even

sedentary work.  The Commissioner responded by asserting that the ALJ

properly considered the medical and non-medical evidence in evaluating

plaintiff's RFC, and that the totality of the evidence supports the ALJ's

RFC finding.  A claimant's RFC represents a finding of the range of tasks

he or she is capable of performing notwithstanding the impairments at

issue.  20 C.F.R. § 404.1545(a).  An RFC determination is informed by

consideration of a claimant's physical abilities, mental abilities,

symptomology, including pain, and other limitations which could interfere

with work activities on a regular and continuing basis.  *Id.*; *Martone v.*

*Apfel*, 70 F. Supp. 2d at 150.

     To properly ascertain a claimant's RFC, an ALJ must therefore

assess exertional capabilities, addressing his or her ability to sit, stand,

walk, lift, carry, push and pull.  20 C.F.R. §§ 404.1545(b), 404.1569a.  The

ALJ must also consider nonexertional limitations or impairments, including

impairments which result in postural and manipulative limitations.  20

C.F.R. §§ 404.1545(b), 404.1569a; *see also* 20 C.F.R. Part 404, Subpt. P,

App. 2 § 200.00(e).  When making an RFC determination, an ALJ must

-52-

specify those functions which the claimant is capable of performing;

conclusory statements concerning his or her capabilities, however, will not

suffice*.  Martone*, 70 F. Supp. 2d at 150 (citing *Ferraris,* 728 F.2d at 587).

An administrative RFC finding can withstand judicial scrutiny only if there

is substantial evidence in the record to support each requirement listed in

the regulations.  *Martone*, 70 F. Supp. 2d at 150 (citing *LaPorta v. Bowen*,

737 F. Supp. 180, 183 (N.D.N.Y. 1990)); *Sobolewski v. Apfel*, 985 F.

Supp. 300, 309-10 (E.D.N.Y. 1997).

At step four, ALJ Brounoff acknowledged that in affixing appropriate

RFC parameters he must consider all of plaintiff's symptoms, including

pain, and the extent to which these symptoms can reasonably be

accepted as consistent with the objective medical evidence and other

evidence based on the requirements of 20 C.F.R. §§ 404.1529, 416.929,

and SSR 96-7p.   As described above, after conducting a survey of the

available medical evidence, ALJ Brounoff determined that plaintiff retains

the RFC for a range of medium work including the ability to perform his

past relevant work as a loss prevention manager, security guard and

security guard supervisor.  AT 25-26.

With the exception of opinions regarding plaintiff's ability to sit for

more than two hours in an eight-hour work day, the exertional elements of

the ALJ's RFC finding draw considerable support from the record,

including opinions of plaintiff's own treating sources.  Dr. Lunney, for

example, has opined that plaintiff can lift and carry up to fifty pounds

occasionally and ten pounds frequently.  AT 275.  The lifting capacities

discerned by Dr. Lunney and the ALJ is also confirmed by a report in

August of 2002 from a treating physician, Dr. Luc Perrier, granting Melillo

permission to undergo a test which would require him to carry two

suitcases weighing forty pounds each, particularly based upon his report

of a walking with his own golf bag weighing approximately seventy-five

pounds. [15] AT 145.

The key area of the ALJ's disagreement with Dr. Lunney's opinion

surrounds the work day sitting requirement.  Without question, as plaintiff

now argues, an ALJ is not generally well-qualified to determine what

symptoms are necessary to support a physician's findings.  *Luiz v. Apfel*,

98 F. Supp. 2d 200, 208 (D. Conn. 1999).  In rejecting that limitation,

however, the ALJ properly considered its lack of reasoning and, in

---

[15]     Those opinions are also consistent with plaintiff's hearing testimony, to
the effect that while working at Bon-Ton during 2002-2003 he was required to lift up to
sixty-five pounds.  AT 369.

particular, the fact the record lacked any evidence attributing an inability to sit to plaintiff's diabetes or right shoulder.[16]  *Schisler*, 3 F.3d at 568; *Edwards v. Barnhart*, Civil No. 3:06cv402(CFD)(TPS), 2007 WL 708802, at *10 (D.Conn. March. 6, 2007).

### 6.   Past Relevant Work Finding

In his challenge of the Commissioner's decision, the plaintiff next assails the ALJ's finding of his ability to perform certain of his past relevant work.  Plaintiff contends that the ALJ's determination of his ability to perform the physical requirements of medium work, which served as one of the lynchpins for the vocational expert's conclusion regarding his past relevant work, is not supported by substantial evidence and that the evidence in the record, in point of fact, reveals that he is incapable of performing even a full range of sedentary work.

At step four, to establish disability a plaintiff must demonstrate that despite any limitations caused by physical or mental conditions he or she

---

[16]     The Second Circuit has noted that "[t]he regulations do not mandate the presumption that all sedentary jobs in the United States require the worker to sit without moving for six hours, trapped like a seat-belted passenger in the center seat on a transcontinental flight."  *Halloran v. Barnhart*, 362 F.3d at 33.  That same holds true with respect to light and medium work.  *See Poupore v. Astrue*, 2009 WL 412952, at *1 (2d Cir. Feb. 19, 2009) (slip op.); *White v. Commissioner of Social Sec.,* 7:05-CV-1013, 2008 WL 820177, *11 (N.D.N.Y. March 26, 2008) (Sharpe, D.J. and DiBianco, M.J.).

is unable to perform prior work either as he or she had actually been performed it in the past, or as that job function is customarily performed. *Jock v. Harris*, 651 F.2d 133, 135 (2d Cir. 1981).  In order to determine whether a claimant is able to perform his or her past work, an ALJ must make a specific and substantial inquiry into the relevant physical and mental demands associated with the claimant's past work and compare those demands to the claimant's residual capabilities.  *Kerulo v. Apfel*, 98 CIV. 7315, 1999 WL 813350, at *8 (S.D.N.Y.1999) (Mukasey, D.J.) (citations omitted).  SSR 82-62 instructs that ordinarily a plaintiff "is the primary source for vocational documentation, and statements by [plaintiff] regarding past work are generally sufficient for determining skill level, exertional and nonexertional demands of such work."  SSR 82-62, 1982 WL 31386 (S.S.A.1982); *see also Guadalupe v. Barnhart*, No. 04 CV 7644, 2005 WL 2033380, at *5-6 (S.D.N.Y. Aug. 24, 2005) (Baer, D.J.).

In making this analysis, the ALJ chose to enlist the assistance of a vocational expert.  The use of such an expert to aid in making the past relevant work inquiry is entirely proper.  *Bapp* v. *Bowen,* 802 F.2d 601, 604-05, (2d Cir. 1986); *Dumas,* 712 F.2d at 1553-54.  It goes without saying, of course, that in measuring the sufficiency of opinions of a

vocational expert regarding past relevant work, the court must insure that

the information imparted to the expert is supported by substantial

evidence in the record.  *Varley v. Sec'y of Health and Human Servs.,* 820

F.2d 777, 779 (6th Cir. 1987).

In this case, the expert was presented with a hypothetical that

included the exertional and non-exertional limitations found in the ALJ's

RFC determination.  Having already concluded that the ALJ's RFC finding

is supported by substantial evidence, I find no error in his recounting them

to the expert for the purpose eliciting his opinions.

In making his past relevant work inquiry, the ALJ referenced the

definition of past relevant work as set forth in the regulations, *see* 20

C.F.R. § 404.1565(a), 416.965(a), and 416.965(a), noting that the

claimant must have performed such work within the past fifteen years or

fifteen years prior to the date of disability and that the work endured for

sufficient period to allow claimant to learn to do the job and to meet the

definition of substantial gainful activity.  *See* AT 25.  In response to the

ALJ's interrogatories, the vocational expert concluded that plaintiff retains

the ability to perform his past relevant work as a loss prevention manager,

security guard and/or security guard supervisor.[17]  That determination is amply supported by substantial evidence in the record.

### 7.  Medical-Vocational Guidelines With Respect To Plaintiff's Age, Education And Work Experience

At step five, the Commissioner bears the burden of showing that there is other work in the national economy that plaintiff is qualified to perform.  *DeChirico v. Callahan*, 134 F.3d 1177, 1179 (2d Cir. 1998).  In appropriate circumstances, where a claimant's non-exertional impairments do not substantially erode the job base upon which it was predicated, an ALJ can utilize the grid as a framework for determining disability, applying plaintiff's specific characteristics, including his or her age, education, and previous work experience to make the analysis.  *Rosa v. Callahan*, 168 F.3d 72,78 (2d Cir. 1999); *Bapp*, 802 F.2d at 604.  In his sixth argument in support of his challenge to the Commissioner's determination, plaintiff asserts that had the grid been utilized, based upon a finding that at best, he is only able to perform a full range of sedentary work, a finding of

---

[17]     In his decision, the ALJ noted that although plaintiff reserved his right to pose additional interrogatories and/or to request a supplemental hearing to address the issue he had neither propounded additional interrogatories nor actually requested a supplemental hearing, instead specifically advising that the case could proceed without such additional evidentiary input.  AT 25-26.

disability would have been mandated under the grid.  The Commissioner's

counters that even in the event of a finding that plaintiff was unable to

perform his past relevant work, there remains substantial evidence to

support a finding of no disability at step five of the sequential evaluation,

citing the vocational expert's identification of other available jobs which the

hypothetical person described by the ALJ could perform.[18]

It is plaintiff's burden to demonstrate that his impairments prevent a

return to his past relevant work.  The ALJ properly found that plaintiff

failed to meet his burden, and concluded that he is capable of performing

his past relevant work, thus curtailing any further analysis.  In this instance

there was no need for the ALJ to proceed to step five and recognize the

burden shifting associated with that step.  Once a finding is made to the

effect that a claimant is capable of returning to his or her past relevant

work, notwithstanding any limitations imposed by physical and mental

conditions, there is no need to proceed further through the sequential

analysis.  *Johnson v. Astrue*, No. 6:03-CV-1510, 2009 WL 8909669, at

---

[18]      The expert opined, for example, that despite his limitations plaintiff is capable of working as a clerk, an actuary, an administrative services manager, an auditor, an insurance broker, a food service manager, a purchasing manager, a production manager, a restaurant manager, a fire inspector, a bailiff, and as an investigator.  AT 120.

*11 (N.D.N.Y. March 30, 2009) (Scullin, Sr. J. and Treece, M.J.);

*Comstock v. Astrue*, No. 07-CV-0989, 2009 WL 116975, at *12-13

(N.D.N.Y. Jan. 16, 2009) (Bianchini, M.J.).  Since I have already

concluded that the ALJ's past relevant work finding is supported by

substantial evidence and resulted from the application of proper legal

principles, I find it unnecessary to address this additional argument of the

plaintiff.  Moreover, even assuming *arguendo* that plaintiff was not capable

of performing his past relevant work, Vocational Expert Alberigi identified

many other positions that the hypothetical person posed by the ALJ could

perform.  Accordingly, this argument provides no basis for renewal of the

ALJ's determination.

### 8.   Pain and Credibility

In his seventh and final argument, plaintiff contends that the ALJ

failed to follow the requisite procedure for assessing his subjective

allegations of pain and other disabling symptoms.  In response to this

argument, the Commissioner notes that the ALJ fully considered plaintiff's

subjective of complaints and other symptoms, properly exercising his

discretion and explaining the basis for doing so, at least partially rejecting

those complaints.

An ALJ must take into account subjective complaints of pain in performing the five step disability analysis.  20 C.F.R. §§ 404.1529(a), (d), 416.929(a), (d).  When examining the issue of pain, however, the ALJ is not required to blindly accept the subjective testimony of a claimant. *Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir. 1979); *Martone*, 70 F. Supp. 2d at 151 (citing *Marcus*, 615 F.2d at 27).  Rather, an ALJ retains the discretion to evaluate a claimant's subjective testimony, including testimony concerning pain.  *See Mimms v. Heckler*, 750 F.2d 180, 185-86 (2d Cir. 1984).  In deciding how to exercise that discretion the ALJ must consider a variety of factors which ordinarily would be relevant on the issue of credibility in any context, including the claimant's credibility, his or her motivation, and the medical evidence in the record.  *See Sweatman v. Callahan*, No. 96-CV-1966, 1998 WL 59461, at *5 (N.D.N.Y. Feb. 11, 1998) (Pooler, D.J. and Smith, M.J.) (citing *Marcus*, 615 F.2d at 27-28)).  In doing so, the ALJ must reach an independent judgment concerning the actual extent of pain suffered and its impact upon the claimant's ability to work.  *Sweatman*, 1998 WL 59461, at *5.

When such testimony is consistent with and supported by objective clinical evidence demonstrating that claimant has a medical impairment

which one could reasonably anticipate would produce such pain, it is entitled to considerable weight.[19]  *Barnett*, 13 F. Supp. 2d at 316; *see also* 20 C.F.R. §§ 404.1529(a), 416.929(a).  If the claimant's testimony concerning the intensity, persistence or functional limitations associated with his or her pain is not fully supported by clinical evidence, however, then the ALJ must consider additional factors in order to assess that testimony, including: (1) daily activities; (2) location, duration, frequency and intensity of any symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness and side effects of any medications taken; (5) other treatment received; and (6) other measures taken to relieve symptoms.  20 C.F.R. §§ 404.1529(c)(3)(i)-(iv), 416.929(c)(3)(i)-(iv).

After considering plaintiff's subjective testimony, the objective medical evidence, and any other factors deemed relevant, the ALJ may accept or reject claimant's subjective testimony.  *Martone*, 70 F. Supp. 2d at 151; *see also* 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4).  If such testimony is rejected, however, the ALJ must explicitly state the basis for doing so with sufficient particularity to enable a reviewing court to

---

[19]     In the Act, Congress has specified that a claimant will not be viewed as disabled unless he or she supplies medical or other evidence establishing the existence of a medical impairment which would reasonably be expected to produce the pain or other symptoms alleged.  42 U.S.C. § 423(d)(5)(A).

determine whether those reasons for disbelief were legitimate, and

whether the determination is supported by substantial evidence.  *Martone*,

70 F. Supp. 2d at 151 (citing *Brandon v. Bowen*, 666 F. Supp. 604, 608

(S.D.N.Y. 1987)).  Where the ALJ's findings are supported by substantial

evidence, the decision to discount subjective testimony may not be

disturbed on court review.  *Aponte v. Sec'y, of Dep't of Health & Human

Servs.*, 728 F.2d 588, 591 (2d Cir. 1984).

In broad and general terms, plaintiff testified to his belief that he is

unable to perform work functions, based upon his symptomology.  *See,*

*e.g.,* AT 387-401.  Citing plaintiff's own testimony regarding his

involvement in making renovations and repairs to a friend's home during

June of 2003, as well as the extent of his daily activities and conservative

course of treatment, including having declined injections offered for pain,

the ALJ concluded that plaintiff testimony was "not entirely credible" when

considered against that backdrop.[20]  AT 24-25.

The ALJ evaluated plaintiff's complaints relative to his activities and

the kinds of medication he took to alleviate his symptoms.  The ALJ

---

[20]     It should be noted that during his evaluation on October 23, 2003 plaintiff informed Dr. William Kimball that prior to June of 2003 he was performing his job as an investigator "at a very high level" and that the reason for leaving that position was due to a personality conflict with a new supervisor.  AT 230.

expressly stated his rationale for finding plaintiff's allegations to be less than credible, and his findings are supported by substantial evidence.  It may be, as plaintiff asserts, that he suffers from some degree of discomfort as a result of his symptomatology.  The fact that he suffers from discomfort, however, does not automatically qualify him as disabled, for "disability requires more than mere inability to work without pain." *Dumas v. Schweiker*, 712 F.2d 1545, 1552 (2d Cir. 1983).

## IV.   SUMMARY AND RECOMMENDATION

The ALJ's determination in this matter, to the effect that plaintiff retains the capacity to perform his past relevant work despite the limitations associated with his physical and mental conditions, is well supported in the record, including by the responses to interrogatories posed to a vocational expert.  In arriving at that conclusion the ALJ properly assessed plaintiff's RFC and rejected, to the extent that they may have been contradictory, plaintiff's subjective claims regarding the effects of his conditions upon his ability to perform work.  Based upon the foregoing, it is therefore hereby respectfully

RECOMMENDED that defendant's motion for judgment on the pleadings be GRANTED, and the Commissioner's determination

AFFIRMED, and that plaintiff's complaint in this action be DISMISSED.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court within TEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P.  6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this Report and Recommendation upon the parties in accordance with this court's local rules.

David E. Peebles
U.S. Magistrate Judge

Dated:     April 23, 2009
           Albany, NY